# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

       Plaintiff,

vs.

MARCO ANTONIO CORTES-GOMEZ (01),

       Defendant.

Case No. 16-40091-01-DDC

## MEMORANDUM AND ORDER

On December 2, 2016, a jury convicted defendant Marco Antonio Cortes-Gomez of two counts: (1) one for conspiracy to possess with intent to distribute a controlled substance; and (2) for attempted possession with intent to distribute a controlled substance. Doc. 38. Soon after, Mr. Cortes-Gomez filed pro se a Motion for New Trial (Doc. 40) and a Motion for Suspension of Sentencing (Doc. 41). Mr. Cortes-Gomez also filed a Motion for Judgment of Acquittal (Doc. 42) and Motion for New Trial (Doc. 43). Later, Mr. Cortes-Gomez filed pro se a Motion to Vacate Conviction (Doc. 57). The court appointed Forrest A. Lowry as new counsel for Mr. Cortes-Gomez in January 2017, and, with the assistance of counsel, Mr. Cortes-Gomez has filed memoranda supporting his Motion for Judgment of Acquittal and Motion for New Trial. Docs. 62, 63. On August 21, 2017, the court held a motion hearing. During the hearing, the court found as moot the pro se Motions for New Trial (Doc. 40), for Suspension of Sentencing (Doc. 41), and to Vacate (Doc. 57). Doc. 69 at 1. The court took under advisement the Motions for Acquittal (Doc. 42) and for New Trial (Doc. 43). *Id.* After carefully considering the facts and arguments presented by the parties, the court denies Mr. Cortes-Gomez's Motions.

## I. Factual and Procedural Background

Law enforcement officers arrested Mr. Cortes-Gomez during a controlled methamphetamine delivery in Topeka, Kansas. Officers arranged the controlled delivery after a Kansas Highway patrol trooper seized 2.3 kilograms of methamphetamine during a traffic stop in Ellis County, Kansas. The methamphetamine was wrapped in five bundles and hidden in a spare tire. The vehicle's driver agreed to cooperate with law enforcement by setting up the controlled delivery and taking the methamphetamine to its intended recipients.

On December 18, 2015, the cooperating driver set up the meeting to drop off a spare tire to two recipients in a Walmart parking lot. Officers later identified the two recipients as Mr. Cortes-Gomez and Juanita Garcia. Before the driver arrived at the Walmart, Mr. Cortes-Gomez suggested they should move to a nearby AutoZone. The driver took the tire to AutoZone where Mr. Cortes-Gomez and Ms. Garcia were waiting to meet him. Officers then arrested Mr. Cortes-Gomez and Ms. Garcia in connection with the planned exchange.

The government charged Brenda Sanders, Robert Worthington, James Ross, Ms. Garcia, and Mr. Cortes-Gomez with conspiracy to distribute methamphetamine from 2013–2015. Ms. Garcia, Ms. Sanders, Mr. Ross, and Mr. Worthington pleaded guilty. *See* Case No. 16-40004, Docs. 106, 124, 148, 149. Mr. Cortes-Gomez pleaded not guilty, and his jury trial began on November 29, 2016. The court appointed Lance Sandage and Sarah Hess to represent Mr. Cortes-Gomez at this trial.

Ms. Garcia, Ms. Sanders, Mr. Ross, and Mr. Worthington all testified for the prosecution at trial. Ms. Garcia testified that she traveled with Mr. Cortes-Gomez to the Topeka Walmart parking lot to pay for and pick up drugs. Doc. 60 at 256–57. She testified that she knew the tire contained drugs because previously she had received methamphetamine deliveries inside a tire.

*Id.* at 257.  Ms. Garcia also testified that the intended recipients of the methamphetamine were Ms. Sanders, Mr. Ross, and a man named Bob.  *Id.* at 260.  Ms. Garcia testified that she does not remember if she and Mr. Cortes-Gomez ever had a conversation about distributing methamphetamine, but that she started getting involved with Mr. Cortes-Gomez's distribution little-by-little—taking money, talking on the phone, sending messages, or riding with Mr. Cortes-Gomez to Topeka.  *Id.* at 263.  Also, she testified that her phone conversations and messages involved distributing methamphetamine.  *Id.*  And, Ms. Garcia testified that when she would ride with Mr. Cortes-Gomez to Topeka, it was for the purpose of distributing methamphetamine, or for retrieving money for methamphetamine.  *Id.*  Ms. Garcia offered testimony that the night that she and Mr. Cortes-Gomez were arrested, she had a notebook in Mr. Cortes-Gomez's car, Doc. 60 at 267, and that the notebook served as a ledger of his drug business.  *Id.* at 268–69.  The ledger listed names of people that they had distributed methamphetamine to, and the amount that they had distributed to them.  *Id.* at 271–72.  In one of the ledger's pages, she had written that they had given Ms. Sanders four pounds and 10 ounces of methamphetamine, and that she had given Mr. Woods three pounds and five ounces of methamphetamine.  *Id.*  Ms. Garcia testified that Mr. Cortes-Gomez decided how much to charge for the methamphetamine.  *Id.* at 274–75.

Mr. Ross also testified at trial against Mr. Cortes-Gomez.  He explained that he and Mr. Cortes-Gomez discussed distributing methamphetamine.  Doc. 60 at 313.  Mr. Ross testified that he paid Ms. Sanders $5,000 for her to introduce him to Mr. Cortes-Gomez so that he would no longer need to use her as a "middleman."  *Id.* at 314.  And, Mr. Ross testified, when he met Mr. Cortes-Gomez, Ms. Garcia translated for them.  *Id.* at 314–15.  He testified that he purchased a pound of methamphetamine from Mr. Cortes-Gomez, and that he did not intend it for personal

use. *Id.* at 315–16. Mr. Ross testified that he had purchased methamphetamine from Mr. Cortes-Gomez about 10 times, and that sometimes, Mr. Cortes-Gomez would front the methamphetamine, meaning that Mr. Cortes-Gomez would provide him with the methamphetamine and he would pay for it later. Doc. 60 at 317. Mr. Ross testified that his transactions with Mr. Cortes-Gomez occurred in Topeka. *Id.* at 319. Mr. Ross also testified that Mr. Cortes-Gomez was present during the transactions, *id.*, and that Mr. Cortes-Gomez had helped him take the methamphetamine out of a tire before. *Id.* at 322–23. Mr. Ross testified that he purchased the methamphetamine to sell to make money. *Id.* at 315–16.

Mr. Worthington testified as well. He explained that he had purchased about two pounds of methamphetamine from Mr. Cortes-Gomez every week for almost two years. *Id.* at 135–36. Mr. Worthington testified that he had bought around 100 kilograms of methamphetamine from Mr. Cortes-Gomez. *Id.* at 139. And, Mr. Worthington testified that he had been with Mr. Cortes-Gomez once when Ms. Sanders had dropped off 11 pounds of methamphetamine inside a tire. *Id.* at 141–42.

A woman named Tara Morales also testified at trial. Doc. 59 at 243. Ms. Morales testified that Mr. Cortes-Gomez talked to her about transporting methamphetamine sometime around 2012. *Id.* at 248–49. Ms. Morales was living in Dallas, Texas, when Mr. Cortes-Gomez asked her to get involved with his drug trafficking efforts. She agreed. *Id.* at 249–50. According to Ms. Morales, Mr. Cortes-Gomez set up everything required for the transportation and all she had to do was transport the drugs. *Id.* at 249–51. She testified that she would drive the methamphetamine to Kansas City and Topeka. *Id.* at 252. And, Ms. Morales testified that Mr. Cortes-Gomez was present when the methamphetamine was unloaded. *Id.* at 253. Ms.

Morales also testified that she allowed Mr. Cortes-Gomez to deposit thousands of dollars into her bank account. *Id.* at 248.

In addition to Mr. Cortes-Gomez's co-conspirators, the government presented evidence from DEA Chemist Edward Erisman who testified that the substance Mr. Cortes-Gomez and Ms. Garcia intended to receive was methamphetamine. Doc. 59 at 210–213.

The jury convicted Mr. Cortes-Gomez of both counts on December 2, 2016, and he was remanded to custody. Mr. Cortes-Gomez immediately filed a Motion for New Trial and Motion for Stay of Sentencing pro se. Docs. 40, 41. Mr. Cortes-Gomez's counsel then filed a Motion for Judgment of Acquittal and Motion for New Trial, and requested more time to file the supporting memoranda, which the court granted. *See* Docs. 42, 43, 45. Soon after, Mr. Sandage and Ms. Hess withdrew as Mr. Cortes-Gomez's attorneys. Docs. 46, 51. The court then appointed Mr. Lowry as Mr. Cortes-Gomez's counsel. Doc. 52. Plaintiff then filed a pro se Motion to Vacate the Conviction. Doc. 57. And, Mr. Lowry filed memoranda supporting Mr. Cortes-Gomez's Motion for Judgment of Acquittal and Motion for New Trial. Docs. 62, 63.

## II.     Motion for Judgment of Acquittal

### A.     Legal Standard

On a motion for judgment of acquittal under Fed. R. Crim. P. 29(c), the court must uphold the jury's verdict of guilty if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Haber*, 251 F.3d 881, 887 (10th Cir. 2001) (citation and internal quotation marks omitted). Put another way, the court will reverse a jury's verdict only if no reasonable juror could have found the defendant guilty. *United States v. Dewberry*, 790 F.3d 1022, 1028 (10th Cir. 2015); *United States v. Magleby*, 241 F.3d 1306, 1312 (10th Cir. 2001).

When reviewing a sufficiency of the evidence argument like Mr. Cortes-Gomez makes

here, the court "must ask only whether taking the evidence—both direct and circumstantial,

together with the reasonable inferences to be drawn therefrom—in the light most favorable to the

government, a reasonable jury could find [defendant] guilty beyond a reasonable doubt."

*Magleby*, 241 F.3d at 1311–12 (citation and internal quotation marks omitted). "[T]he evidence

necessary to support a verdict need not conclusively exclude every other reasonable hypothesis

and need not negate all possibilities except guilt." *Id.* at 1112 (citation and internal quotation

marks omitted). And, "where conflicting evidence exists," the court must "not question the

jury's conclusions regarding the credibility of witnesses or the relative weight of evidence." *Id.*

Instead, the court simply must "determine whether [the] evidence, if believed, would establish

each element of the crime." *United States v. Vallo*, 238 F.3d 1242, 1247 (10th Cir. 2001)

(quoting *United States v. Evans*, 42 F.3d 586, 589 (10th Cir. 1994)). The court thus must give

"considerable deference to the jury's verdict." *Dewberry*, 790 F.3d at 1028 (citation and internal

quotation marks omitted). But while the court's review is deferential, the evidence must do

"more than raise a mere suspicion of guilt." *Id.* (internal quotation marks and citation omitted).

And, any inferences drawn from direct and circumstantial evidence "must be more than

speculation and conjecture to be reasonable." *Id.* (citation and internal quotation marks omitted).

## B. Analysis

Mr. Cortes-Gomez raises three arguments to support his Motion for Judgment of

Acquittal. First, Mr. Cortes-Gomez asserts that the weight of the evidence at trial was

insufficient to find him guilty beyond a reasonable doubt on Counts 1 and 2. Second, Mr.

Cortes-Gomez contends that the court should have dismissed the Indictment because his Speedy

Trial rights were violated. Finally, Mr. Cortes-Gomez asserts that the prosecution's late

disclosure of Ms. Morales's proffer harmed his ability to investigate Ms. Morales fully before

trial.  The court addresses these arguments in the next three sections.

### 1.  Sufficiency of Evidence

### a.  Count 1:  Conspiracy to Possess with Intent to Distribute

Count 1 charges plaintiff with conspiracy to possess with intent to distribute

methamphetamine.  A conviction on Count 1 requires the government to prove beyond a

reasonable doubt:  (1) an agreement between Mr. Cortes-Gomez and at least one other person to

violate federal drug laws; (2) that Mr. Cortes-Gomez knew of the essential objective of the

conspiracy; (3) that Mr. Cortes-Gomez knowingly and voluntarily involved himself in the

conspiracy; and (4) interdependence existed among the members of the conspiracy.  *See United

States v. Nicholson*, 136 F. App'x 145, 146 (10th Cir. 2005); *see also* Doc. 35 at 13 (Jury

Instruction for Count 1).  Here, the government presented far more than sufficient evidence to

establish each element of this charge.

The first element required the government to present evidence supporting an agreement

between Mr. Cortes-Gomez and at least one other person to possess and distribute

methamphetamine.  *See United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009).  An

agreement may be express or implied, and "may be inferred entirely from circumstantial

evidence."  *Id.*  Circumstantial evidence includes "the joint appearance of defendants at

transactions and negotiations in furtherance of the conspiracy."  *Id.*

The government presented testimony by Mr. Worthington that he had purchased

methamphetamine from Mr. Cortes-Gomez, and that he had been with Mr. Cortes-Gomez when

Ms. Sanders delivered a tire containing the drug to Mr. Cortes-Gomez.  And, Ms. Morales

testified that Mr. Cortes-Gomez recruited her to transport methamphetamine from Texas to

Kansas. Ms. Garcia also testified that she went with Mr. Cortes-Gomez to Walmart to meet the driver and pick up the tire full of methamphetamine. And, Ms. Garcia testified that she and Mr. Cortes-Gomez were together when the driver arrived to deliver the tire. She also testified that she had gone to Topeka with Mr. Cortes-Gomez to distribute methamphetamine and, at other times, to collect drug proceeds. This evidence is more than sufficient for a reasonable jury to infer that Mr. Cortes-Gomez had an agreement with at least one other person to distribute methamphetamine.

Proof of the elements of a conspiracy charge tend to overlap. *United States v. Pickel*, No. 16-3041, 2017 WL 3028502, at *7 (D. Kan. Jul. 18, 2017). The second element requires the government to show that the defendant had a "general awareness of both the scope and the objective of the" conspiracy. *Id.* (quoting *United States v. Hamilton*, 587 F.3d 1199, 1206 (10th Cir. 2009)). Evidence "establishing that a defendant purchased drugs on multiple occasions and for the purpose of resale, as opposed to a one time purchase for personal use" indicates the defendant "shared common goals with the larger conspiracy." *United States v. Small*, 423 F.3d 1164, 1183 (10th Cir. 2005). And the third element requires the government to show that defendant knowingly and voluntarily became involved in the conspiracy. The testimony by Mr. Worthington, Mr. Ross, Ms. Sanders, and Ms. Garcia supports these second and third elements in addition to the first element.

Finally, the government presented evidence at trial showing interdependence among the members of the conspiracy. "Interdependence is established when each co-conspirator's actions are necessary to establish a common, illicit goal." *United States v. Rogers*, 556 F.3d 1130, 1138–39 (10th Cir. 2009). The testimony at trial provided ample evidence for a rational jury to conclude that Mr. Cortes-Gomez's role was necessary to the ultimate objectives of the

conspiracy—possessing methamphetamine with the intent to distribute it. In sum, a reasonable jury could conclude that Mr. Cortes-Gomez is guilty of Count 1 beyond a reasonable doubt.

Mr. Cortes-Gomez urges the court to consider evidence that, he contends, makes the verdict unreasonable. First, Mr. Cortes-Gomez emphasizes that it was the driver, and not Mr. Cortes-Gomez, who started to reach under the truck to get to the spare tire holding the drugs. Doc. 62 at 2. Then, Mr. Cortes-Gomez contends that the officer at the scene never saw Mr. Cortes-Gomez take possession of the drugs, and that while he saw Mr. Cortes-Gomez talking to the driver, they may not have been talking about the drugs. *Id.* Indeed, Mr. Cortes-Gomez contends that Ms. Garcia, and not Mr. Cortes-Gomez, asked the driver about the drugs, and that the officer's texts to Ms. Sanders never referenced Mr. Cortes-Gomez when he pretended to be Ms. Garcia. *Id.* at 3. Finally, Mr. Cortes-Gomez emphasizes that the yellow notebook with the ledger was in Ms. Garcia's bag, and not in Mr. Cortes-Gomez's possession, and Mr. Cortes-Gomez was never seen with methamphetamine—or large amounts of cash—on his person or in his control. *Id.*

A Rule 29 Motion requires the court to "determine whether [the] evidence, if believed, would establish each element of the crime." *Vallo*, 238 F.3d at 1247 (quoting *Evans*, 42 F.3d at 589). And here, a reasonable jury could reach the verdict that it did on Count 1. The government presented testimony from four of Mr. Cortes-Gomez's co-conspirators, all who testified about different times that Mr. Cortes-Gomez had facilitated methamphetamine transactions. And, the transactions they described exceeded that of a buyer-seller relationship. Specifically, Mr. Ross and Mr. Worthington described transactions involving quantities capable of supporting a conclusion that Mr. Cortes-Gomez and his co-conspirators agreed to distribute the drug to make a profit. This evidence, if believed, supports that Mr. Cortes-Gomez was part

of an agreement, that he knew the essential objectives of the agreement, that he agreed to participate knowingly and voluntarily, and that his actions were necessary to establish the goal of the conspiracy.

Mr. Cortes-Gomez urges the court to consider other evidence that, if believed, could cast some doubt on whether Mr. Cortes-Gomez was a fully knowing and voluntary member of the conspiracy. And, as discussed above, the "evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Magleby*, 241 F.3d at 1311–12 (citation and internal quotation marks omitted). The evidence the government presented at trial sufficiently supports the verdict so that a reasonable jury could find Mr. Cortes-Gomez guilty of Count 1 beyond a reasonable doubt. The jury so concluded here, and the court must give "considerable deference to the jury's verdict." *Dewberry*, 790 F.3d at 1028. The court thus denies defendant's Motion for Judgment of Acquittal on Count 1.

### b. Count 2: Attempted Possession with Intent to Distribute

Count 2 charges Mr. Cortes-Gomez with attempted possession with intent to distribute 500 grams or more of a substance containing methamphetamine. A conviction on Count 2 requires the government to prove each of the following beyond a reasonable doubt: (1) Mr. Cortes-Gomez knowingly or intentionally possessed or attempted to possess a controlled substance as charged; (2) the substance was methamphetamine; (3) Mr. Cortes-Gomez possessed or attempted to possess the substance with the intent to distribute it; and (4) the amount of the controlled substance he possessed, or attempted to possess, was at least 500 grams or more of a substance containing methamphetamine. *See* Doc. 35 at 18 (Court's Jury Instructions); *see also United States v. Winder*, 557 F.3d 1129, 1137 (10th Cir. 2009).

At trial, the government presented ample evidence to support the jury's conviction on Count 2. "The crime of attempting to possess requires the government to prove that [Mr. Cortes-Gomez] possessed the requisite criminal intent, as well as 'the commission of an act which constitutes a substantial step towards commission of the substantive offense.'" *United States v. Ramirez*, 348 F.3d 1175, 1180 (10th Cir. 2003) (quoting *United States v. Becker*, 230 F.3d 1224, 1234 (10th Cir. 2000)). The substantial step "'must be something beyond mere preparation.'" *Id.* (quoting *United States v. Smith*, 264 F.3d 1012, 1016 (10th Cir. 2001)). The step must be "strongly corroborative of the firmness of the defendant's criminal intent and must unequivocally mark the defendant's acts as criminal." *Id.* Whether defendant's conduct constitutes a substantial step depends on the facts of the case. *Id.*

Here, the government presented evidence that the Mr. Cortes-Gomez possessed the requisite intent and took a substantial step toward possessing methamphetamine with the intent to distribute it. At trial, Ms. Garcia testified that she and Mr. Cortes-Gomez traveled to the agreed upon location—Walmart, and then AutoZone— to receive a tire filled with methamphetamine from the cooperating driver. This alone qualifies as a substantial step. *See Ramirez*, 348 F.3d at 1180–81 (viewing the facts in the light most favorable to the government, defendant's conduct supported an attempted possession when he agreed on a time and place where he would bring the drugs and then traveled to the agreed upon location). Ms. Garcia also testified that she and Mr. Cortes-Gomez had driven a second car to the AutoZone to provide the cooperating driver as part of the compensation for the methamphetamine. And, the government presented evidence that the substance Mr. Cortes-Gomez intended to receive in Topeka was methamphetamine. This is evidence that Mr. Cortes-Gomez's actions constituted more than mere preparation and took steps unequivocally marking his acts as criminal.

And, the government presented evidence that Mr. Cortes-Gomez intended to possess the methamphetamine to distribute it. Ms. Garcia testified that Ms. Sanders, Mr. Worthington, and Mr. Ross were the intended recipients of the methamphetamine. Indeed, Ms. Garcia helped officers set up controlled deliveries with these co-conspirators. And, the ledger that officers recovered from Ms. Garcia detailed quantities that previously had been distributed to Mr. Ross, Mr. Worthington, and Ms. Sanders.

Finally, the government presented evidence that the DEA chemist had determined that the substance seized from the tire weighed 2.3 kilograms. This exceeds the 500 grams required by the charge. In sum, the government presented evidence from which a reasonable jury could conclude that Mr. Cortes-Gomez was guilty of Count 2 beyond a reasonable doubt.

Mr. Cortes-Gomez again asks the court to consider evidence that, he contends, casts some doubt on whether Mr. Cortes-Gomez attempted to possess methamphetamine with the intent to distribute it. But, as the court discussed above, a Rule 29 Motion does not ask the court to "conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *Magleby*, 241 F.3d at 1311–12. The court only needs to "determine whether [the] evidence, if believed, would establish each element of the crime." *Vallo*, 238 F.3d at 1247 (quoting *Evans*, 42 F.3d at 589). The evidence does so, here, and a reasonable jury could reach the verdict that it did on Count 2.

### 2. Speedy Trial

In his Motion for Judgment of Acquittal, Mr. Cortes-Gomez renews his arguments from his Motion to Dismiss the Indictment (Doc. 16). In that Motion, Mr. Cortes-Gomez argued that the government had violated his statutory and Sixth Amendment speedy trial rights. The motion for judgment of acquittal standard is not the appropriate standard to review Mr. Cortes-Gomez's

speedy trial argument. Mr. Cortes-Gomez's speedy trial rights exist separate and apart from the evidence presented in this case. Regardless, the court already has considered all of Mr. Cortes-Gomez's speedy trial arguments in its Memorandum and Order filed November 23, 2016. Doc. 26. The court's conclusion is still the same. Mr. Cortes-Gomez's Speedy Trial rights were not violated.

### 3. Report Statements

During the investigation of Mr. Cortes-Gomez, Kansas law enforcement learned of Ms. Morales' connection to Mr. Cortes-Gomez. Law enforcement in the Northern District of Texas was holding Ms. Morales on a separate offense. Kansas law enforcement travelled to Texas to interview Ms. Morales. Northern District of Texas law enforcement officials interviewed Ms. Morales first while Kansas law enforcement observed. Then, Kansas law enforcement interviewed Ms. Morales. The law enforcement officials from each jurisdiction completed their own reports. The government produced the report completed by Kansas law enforcement ("first report")[1] during discovery. But, the government was not aware of and did not produce the report completed by Northern District of Texas law enforcement ("second report")[2] until Mr. Cortes-Gomez's defense counsel inquired about it immediately after the direct examination of Ms. Morales at trial.

Mr. Cortes-Gomez now moves the court to set aside the verdict because the prosecution disclosed the second report from Ms. Morales's interview in the Northern District of Texas later than it should have disclosed it. Doc. 59 at 280–81. At trial, Mr. Cortes-Gomez moved for a mistrial due to the late disclosure. Doc. 60 at 20. The court took Mr. Cortes-Gomez's Motion under advisement pending the defense's cross-examination of Ms. Morales. *Id.* at 32, 96. The

---

[1] Attached as Sealed Exhibit 1.

[2] Attached as Sealed Exhibit 2.

court later denied Mr. Cortes-Gomez's Motion, finding that the defense's cross-examination of Ms. Morales was effective and that the late disclosure did not prejudice Mr. Cortes-Gomez. Doc. 61 at 4–5.

Mr. Cortes-Gomez asserts, now for the second time, that the late disclosure prejudiced him because his defense team could not investigate Ms. Morales's statements and interactions in Texas thoroughly. Mr. Cortes-Gomez contends that his counsel's ability to cross-examine Ms. Morales effectively on the issue did not cure the harm he sustained from the late disclosure. And, Mr. Cortes-Gomez asserts that the defense could have investigated other unspecified issues about Ms. Morales's actions in Texas if the government had disclosed the report earlier.

The court ruled this issue from the bench during trial. Doc. 61 at 5. The court provides a more thorough analysis here, but the result is the same—the disclosure of the second report does not warrant a judgment of acquittal.

The analysis is best digested by answering two questions: (1) Was Mr. Cortes-Gomez entitled to the second report? and (2) Was Mr. Cortes-Gomez prejudiced by the timing of the disclosure? The answer to both questions is no.

### a. Not Entitled to Report

Mr. Cortes-Gomez was not entitled to the second report because: (1) it was not the type of information covered by Fed. R. Crim. P. 16; (2) it was not a "statement" requiring production under Fed. R. Crim. P. 26.2 or the Jencks Act; and (3) it was not evidence requiring disclosure under *Brady*[3] or *Giglio*.[4]

The second report is not covered by Fed. R. Crim. P. 16, so Mr. Cortes-Gomez was not entitled to it. Fed. R. Crim. P. 16(a)(2) limits disclosure of information to six types. *See* Fed. R.

___

[3] *Brady v. Maryland*, 373 U.S. 83 (1963).

[4] *United States v. Giglio*, 405 U.S. 150 (1972).

Crim. P. 16(a)(2). Upon a defendant's request, the government must disclose to the defendant: (1) any relevant statement made by the defendant, before or after arrest; (2) any relevant written or recorded statement by the defendant; (3) statements by the organization, if the defendant is an organization; (4) a defendant's prior criminal record; (5) results or reports of physical and mental examinations; and (6) a summary of intended expert witness testimony. *See* Fed. R. Crim. P. 16(a)(1)(A)–(D), (F), (G). The second report is a law enforcement official's summary of a proffer interview conducted with a witness. Thus, it does not fall within any of the six categories within Rule 16(a)(1). So, Mr. Cortes-Gomez was not entitled to it under that rule.

Also, the second report was not a "statement" requiring production under Fed. R. Crim. P. 26.2 or the Jencks Act so Mr. Cortes-Gomez was not entitled to it. If a party moves the court after a witness has testified on direct examination, Fed. R. Crim. P. 26.2 and the Jencks Act require the nonmoving party to produce any statement of the witness that is in the nonmoving party's possession and that relates to the subject matter of the witness's testimony. 18 U.S.C. § 3500(b); Fed. R. Crim. P. 26.2(a). Both Rule 26.2 and the Jencks Act define a statement as: (1) a written statement that the witness made and signed or otherwise adopted and approved; (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement; and (3) a statement to a grand jury.[5] The defendant bears the burden of showing that "particular

---

[5] Under Fed. R. Crim. P. 26.2, a witness's statement is:

> (1) a written statement that the witness makes and signs, or otherwise adopts or approves;
> (2) a substantially verbatim, contemporaneously recorded recital of the witness's oral statement that is contained in any recording or any transcription of a recording; or
> (3) the witness's statement to a grand jury, however taken or recorded, or a transcription of such a statement.

Fed. R. Crim. P. 26.2(f). Under the Jencks Act, a government witness's statement is:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;

materials qualify as 'Statements' and that they related to the subject matter of the testimony of the witness." *United States v. Smaldone*, 544 F.2d 456, 460 (10th Cir. 1976) (citing *United States v. Pennett*, 496 F.2d 293 (10th Cir. 1974)).  The defendant has failed to provide any argument to support the contention that the second report is a statement under the meaning of Rule 26.2 or the Jencks Act.  The court finds that it is not a statement.

Only one definition of a statement requires analysis here—a substantially verbatim, contemporaneously recorded recital of the witness's oral statement.  Both the first and third definitions—a written statement that the witness made and signed or otherwise adopted and approved, and a statement to a grand jury—can be eliminated summarily because the second report does not fall into either category.  Interview notes are considered a "substantially verbatim recital if they can 'fairly be deemed to reflect fully and without distortion what had been said to the government agent.'"  *United States v. Daniels*, 174 F. Supp. 2d 1205, 1207 (D. Kan. 2001) (quoting *Palermo v. United States*, 360 U.S. 343, 352 (1959)).  The *Daniels* court adopted three factors from a Second Circuit case to determine if notes are substantially verbatim:  "(1) the extent to which they conform to the language of the witness, (2) the length of the notes in comparison to the length of the interview, and (3) the lapse of time between the interview and the note-making."  *Id.* at 1208 (citing *United States v. McKeever,* 271 F.2d 669, 674–75 (2d Cir. 1959)).  Further, the Supreme Court held that "summaries of an oral statement which evidence

---

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced." *Palermo*, 360 U.S. at 352–53. Under the *Daniels* factors, the notes are not substantially verbatim.

The language of the second report does not conform to the language of the Ms. Morales. In the absence of being able to observe the interview and read the second report, the court had the next best option—to observe Ms. Morales testify and to read the second report. And, when ruling on this issue at trial, the court noted, "having watched Ms. Morales testify and with all respect for her, I cannot imagine anyone would think that the report, the language that's used in the report from the Northern District of Texas is substantially verbatim to what Ms. Morales said in the interview." Doc. 60 at 21–22. The second factor is neutral because the court does not know the length of the interview. The final factor—the length of time between the interview and the note-making—weighs against the notes being substantially verbatim. The interview took place on August 26, 2016 and the report was prepared on September 2—a period of six days. At trial, the court stated, "I--I don't think even six or seven days, a gap of that nature, is the kind that favors a finding that the report from the Northern District of Texas is a substantially verbatim account of what Ms. Morales said." *Id.* at 22.

In addition to these factors, the government provides a side-by-side comparison of several passages from the first and second report.[6] This comparison demonstrates that neither

---

6  Doc. 67 at 44–45. There, the government noted:

The [second] report [] stated:

Pintor-Espitia needed a trusted U.S. citizen to open bank accounts and conduct wire transfers from Kansas to Dallas because he feared bulk cash loads would be interdicted in transit. Tara Morales agreed to assist Pintor-Espitia for a profit of $100 per transfer. Morales began making cash transfers of approximately $3,000 - $5,000 about 1 to 2 times per week.

(¶ 4.)  The [first] report [] stated:

report is substantially verbatim because they vary from one another in specificity and emphasis. Each report focuses on the relevant details of each jurisdiction's case, indicating that neither is substantially verbatim. The *Daniels* factors combined with this comparison demonstrates that the second report is not substantially verbatim notes of Ms. Morales's interview. The second report thus is not a statement under Rule 26.2 or the Jencks Act. Ultimately, it is the type of

---

Morales stated that after the drug delivery, Pintor asked Morales if they (Cortes and Pintor) could use Morales' bank account to deposit drug proceeds. Pintor explained the drug proceeds would be placed into Morales bank account in Kansas City, and Morales would withdraw the drug proceeds in Dallas, TX. SA Kline asked Morales why she believed Cortes and Pintor would want to use her bank accounts, and she believed because she had a business. Morales believed they wouldn't have to worry about getting stopped by law enforcement with drug proceeds while trying to transport them to Dallas.

(¶¶ 7, 8.)

. . .

The [second] report [] stated:

Eventually Morales became tired of the process and told Pintor-Espitia that she wanted out of the business. Pintor-Espitia agreed to allow Morales out of the business if she agreed to conduct a methamphetamine deal in Dallas. Morales agreed and followed Pintor-Espitia's instructions to meet an unidentified Latin male at the McDonald's on I-35 in Dallas to receive methamphetamine and deliver it to other unidentified Latin males at the Walmart on I-30 in Dallas where she would receive $8,000 for the drugs. Once at Walmart, a Latin male with a tattoo on his arm bearing the words "Las Vegas" instructed Morales to follow him to a Dallas area house where she would be paid. Once at the house, the Latin males entered the house with the drugs, left Morales in the car, and never returned. When Morales left the location and informed Pintor-Espitia, he informed Morales that she was now in debt for $8,000. Years later Morales learned that Pintor-Espitia set up this robbery from the beginning to force Morales into servitude in his drug enterprise.

(¶ 6.) Whereas, the [first] report [] states:

SA Kline asked Morales when she began transporting methamphetamine to Topeka, KS and Kansas City, KS. Morales stated there was a discrepancy with the proceeds she was delivering, and she was told she owed $15,000. Morales stated she transported the methamphetamine as a way to work off the debt owed to Pintor and Cortes.

(¶ 14.)

Doc. 67 at 44–45.

18

summary the *Palermo* Court contemplated was not to be produced because it was prepared from the agent's memory without the benefit of complete notes. For those reasons, Mr. Cortes-Gomez is not entitled to it.

Also, the second report is not evidence requiring disclosure under *Brady* or *Giglio*. *Brady* requires the government to disclosure favorable and material evidence to the defendant when requested. 373 U.S. at 87. Therefore, to prove a *Brady* violation, the defendant must show that the government suppressed favorable and material evidence. *Trammell v. McKune*, 485 F.3d 546, 551 (10th Cir. 2007).

Turning to the favorability factor: "[I]nformation must be favorable to the point of being expressly exculpatory: 'If a statement does not contain any expressly exculpatory material, the Government need not produce that statement to the defense. To hold otherwise would impose an insuperable burden on the Government to determine what facially non-exculpatory evidence might possibly be favorable to the accused by inferential reasoning.'" *United States v. Jackson*, 850 F. Supp. 1481, 1501 (D. Kan. 1994) (quoting *United States v. Comosona*, 848 F.2d 1110, 1115 (10th Cir. 1988); *see United States v. Bagley*, 473 U.S. 667, 676 n.7 (1985). "Exculpatory evidence goes to the heart of the defendant's guilt or innocence. Information is not exculpatory merely because it is not inculpatory." *Jackson*, 850 F. Supp. at 1501. Here, the government argues that not only is the second report not exculpatory, it actually is inculpatory. Doc. 67 at 48. The court agrees. Ms. Morales identifies Mr. Cortes-Gomez as a drug trafficker (¶ 3). And, she discussed trips she made from Phoenix, Arizona to Topeka, Kansas on his behalf (¶ 9). The second report corroborates Ms. Morales' testimony. *See* Doc. 59 at 259–61. The court thus finds that the second report was not favorable.

The final issue is materiality of the evidence. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Jackson*, 850 F. Supp. at 1501 (quoting *Bagley,* 473 U.S. at 682). Here, the second report was disclosed to the defense so the inquiry becomes whether the result of the proceeding would have been different had the report been disclosed earlier. Defense counsel contends that he could have conducted additional investigation. Doc. 62 at 8–9. Although our Circuit does not allow speculation about materiality, it does allow the court to draw reasonable inferences because it recognizes that "evidence in the hands of a competent defense attorney may be used to uncover other leads and defense theories." *Banks v. Reynolds*, 54 F.3d 1508, 1519 (10th Cir. 1995). But, the second report is so similar in content to the first report that it is hard to conceive that defense counsel could have developed theories from the second report but not the first. It is also unlikely that defense counsel could have uncovered other leads because, as defense counsel admits, Mr. Pintor's name was missed once during redaction of the first report so defense counsel could have investigated that lead. *See* Doc. 60 at 30. There is little reason to believe that defense counsel could have uncovered other leads or defense theories. Thus, the court concludes that no reasonable probability exists that the result of the trial would have been different if the report had been disclosed earlier. The court thus finds that the second report lacks materiality for a *Brady* violation.

*Giglio* held that "[i]mpeachment evidence falls within the *Brady* rule when the reliability of a given witness may be determinative of the defendant's guilt or innocence." *Id.* (citing *Giglio,* 405 U.S. at 154). Therefore, "'[i]mpeachment evidence merits the same constitutional treatment as exculpatory evidence.'" *United States v. Abello–Silva,* 948 F.2d 1168, 1179 (10th

Cir. 1991) (quoting *Bowen v. Maynard,* 799 F.2d 593, 610 (10th Cir. 1986), *cert. denied,* 479 U.S. 962 (1986)), *cert. denied,* 506 U.S. 835 (1992). "Impeachment evidence is material if it tends to undermine the credibility of an important government witness." *Jackson*, 850 F. Supp. at 1502. Similar to the analysis of materiality under the *Brady* inquiry, the defense had the first report and was able to prepare a cross examination using the report. The defense also received the second report prior to the cross examination of Ms. Morales and had time to prepare a fulsome cross-examination of her. The court concludes that even if the reliability of Ms. Morales was determinative of Mr. Cortes-Gomez's guilt or innocence—a view that the record as a whole cannot support—the defense had an opportunity to use the second report to undermine her credibility. The court thus finds that there was no *Giglio* violation.

Ultimately, the court finds that Mr. Cortes-Gomez was not entitled to the second report under Fed. R. Crim. P. 16, Fed. R. Crim. P. 26.2, the Jencks Act, *Brady*, or *Giglio*.

### b. Not Prejudiced

Mr. Cortes-Gomez was not prejudiced by the timing of the disclosure. "Distinctions between late disclosure and non-disclosure, good faith and bad faith, have no relevance if the government's conduct prejudices the outcome of the case." *United States v. Gonzalez-Montoya*, 161 F.3d 643, 651 (10th Cir. 1998). However, the *Gonzalez-Montoya* court found that the defendant was not prejudiced by the untimely disclosure of *Giglio* information because defense counsel had an opportunity to review the new evidence and question the witness on it. *Id.* Here, as this court concluded at trial, defense counsel had an opportunity to review the second report and then used it effectively during the cross-examination of Ms. Morales. Doc. 61 at 5. In addition to the opportunity to observe this cross-examination of Ms. Morales with the second report, the jury received instructions that it must examine and weigh Ms. Morales' testimony with greater care and it must weigh the credibility of witnesses. Doc. 35 at 29–30. The court

thus finds that Mr. Cortes-Gomez was not prejudiced by the timing of the disclosure. Regardless, Mr. Cortes-Gomez was not entitled to the second report. The court thus concludes that Mr. Cortes-Gomez does not deserve a judgment of acquittal because of the timing of the disclosure.

### III.    Motion for New Trial

#### A.  Legal Standard

Fed. R. Crim. P. 33 provides that the court may grant a motion for a new trial "if the interest of justice so requires." "A motion for new trial under Rule 33 is not regarded with favor and is granted with great caution." *United States v. Herrera*, 481 F.3d 1266, 1269–70 (10th Cir. 2007); *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999). "The defendant has the burden of proving the necessity of a new trial." *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) (citing *United States v. Davis*, 15 F.3d 526, 531 (6th Cir. 1994) (further citations omitted)). And, the decision whether to grant a motion for new trial is committed to the sound discretion of the trial court. *United States v. Cesareo-Ayala*, 576 F.3d 1120, 1126 (10th Cir. 2009); *Herrera*, 481 F.3d at 1270; *Quintanilla*, 193 F.3d at 1146.

#### B.  Analysis

Two of Mr. Cortes-Gomez's motions ask the court to vacate his convictions and grant him a new trial. Mr. Cortes-Gomez, filing pro se, moved the court to vacate his conviction. Doc. 57. In this motion, Mr. Cortes-Gomez asks the court to release him from custody because his conviction was obtained illegally. Doc. 57 at 3. In his Motion for a New Trial, which he supported with memoranda filed by counsel, Mr. Cortes-Gomez outlines several more reasons why the court should grant a new trial. *See* Doc. 63. After carefully considering his arguments,

the court concludes that the interests of justice do not require a new trial. The following paragraphs discuss the court's reasoning.

*First*, Mr. Cortes-Gomez contends that the weight of the evidence at trial was insufficient to find him guilty beyond a reasonable doubt on Counts 1 and 2. The court already concluded that the evidence presented at trial was sufficient to support Mr. Cortes-Gomez's convictions on both counts. Indeed, when deciding a motion under Rule 29, the court takes the evidence in the light most favorable to the government. *Magleby*, 241 F.3d at 1311–12. In a motion for a new trial, the court does not take the evidence in the light most favorable to the government, but the court should only grant a new trial if the "evidence preponderates heavily against the verdict." *Cesareo-Ayala*, 576 F.3d at 1126. That is not the case here. Mr. Cortes-Gomez urges the court to consider the same evidence which he relied on in his Motion for Judgment of Acquittal: (1) the driver reached for the tire containing the drugs and not Mr. Cortes-Gomez; (2) the law enforcement officer never saw Mr. Cortes-Gomez take possession of the methamphetamine; (3) Mr. Cortes-Gomez was not involved in any controlled purchases; (4) Ms. Garcia asked about the tire, Mr. Cortes-Gomez did not; (5) law enforcement admitted it was possible that Mr. Cortes-Gomez wanted to go to AutoZone so that the driver could fix his vehicle; (6) Mr. Cortes-Gomez was never mentioned in the texts between officers pretending to be Ms. Garcia and Ms. Sanders; (8) agents never saw Mr. Cortes-Gomez with drugs or large amounts of cash; and (9) officers found the yellow notebook in Ms. Garcia's bag. And, in his pro se motion, Mr. Cortes-Gomez broadly asserts that the case against him contained hundreds of issues including perjured witnesses. Doc. 57 at 2.

As the court discussed above, this evidence, taken as true, casts some doubt on whether Mr. Cortes-Gomez is guilty of Counts 1 and 2. *See supra* Part.II.A.1. But "some doubt" does

not meet the "heavily against the verdict" standard which the court uses when deciding whether to grant a new trial. *Cesareo-Ayala*, 576 F.3d at 1126. The government presented testimony by Mr. Cortes-Gomez's co-conspirators as well as DEA agents, and this evidence more than sustains the jury's verdict. The interests of justice do not require the court to grant a new trial for this reason.

*Second*, Mr. Cortes-Gomez contends that the court failed to give a sufficient instruction about accomplice testimony. The court gave the following jury instruction about accomplice witnesses:

> An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony of an alleged accomplice may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice, unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a guilty plea to the offense charged is not evidence of the guilt of any other person.

Doc. 35 at 28. Mr. Cortes-Gomez proposed the following jury instruction on this issue:

> You should also scrutinize the witnesses' testimony closely to determine whether or not it is colored in such a way as to place guilt upon the defendant in order to further the witnesses' own interests. Such a witness, confronted with the realization that he or she can win his or her own freedom or reduce his or her period of incarceration by helping to convict another, has a motive to falsify or exaggerate his or her testimony against the defendant.

Doc. 25 at 12. Mr. Cortes-Gomez contends that the court's instruction does not explain sufficiently why great care is needed when weighing accomplice testimony, and that the "essential nature and paramount importance of the instruction was almost certainly lost on the jury." Doc. 63 at 8. Mr. Cortes-Gomez contends that his proposed jury instruction better accomplishes this end, and because the bulk of the evidence in this case was based on

accomplice testimony, a better instruction was critical. But the court used the pattern jury instruction from the Tenth Circuit Court of Appeals. *See* Tenth Circuit Criminal Pattern Jury Instruction §1.14. This instruction sufficiently communicated that the jury should receive and consider accomplice testimony cautiously. The interests of justice do not require the court to grant a new trial.

### IV.     Conclusion

For the reasons explained above, the court denies Mr. Cortes-Gomez's Motion for Judgment of Acquittal (Doc. 42) and Motion for New Trial (Doc. 43). The government presented evidence sufficient for a rational juror to find Mr. Cortes-Gomez guilty beyond a reasonable doubt of the 2 counts on which the jury convicted him. And, Mr. Cortes-Gomez has failed to show that the ends of justice require a new trial.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendant Marco Antonio Cortes-Gomez's Motion for Judgment of Acquittal (Doc. 42) is denied.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant Marco Antonio Cortes-Gomez's Motion for New Trial (Doc. 43) is denied.

**IT IS SO ORDERED.**

**Dated this 20th day of September, 2017, at Topeka, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**